STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

| | |
|---|---|
| Hinesburg Hannaford Act 250 Permit | Docket No. 113-8-14 Vtec |

## Decision on Motions to Reconsider

On April 12, 2016, this Court issued its Decision on the Merits in the Act 250 appeal concerning the proposal by Applicant Martin's Foods of South Burlington to construct a 36,000-square-foot grocery store and associated parking lot on Lot 15 of the Commerce Park subdivision in Hinesburg, Vermont (the Project).  See In re Hinesburg Hannaford Act 250 Permit, No. 113-8-14 Vtec, slip op. (Vt. Super. Ct. Apr. 12, 2016) (Walsh, J.).  Now before the Court are motions to reconsider and alter our decision, filed by a group Hinesburg residents opposed to the Project (Appellants), Applicant, and the Town of Hinesburg (Town).[1]  The Natural Resources Board (NRB) responded to these motions, but has not filed its own motion to reconsider.  The parties' motions raise issues with five areas of our decision: 1) our Rule 34 analysis permitting an amendment of a condition in the 1987 Act 250 Permit requiring a 75-foot setback from the canal; 2) our Criterion 9(K) analysis with respect to the Project's impact on the public's use and enjoyment of the canal path; 3) our factual findings concerning the Project's stormwater impacts; 4) our approval of the proposed 200-foot long grass swale that runs east to west along the northern border of Lot 15 (East-West swale) as an appropriate water quality treatment measure; and 5) the adequacy and appropriateness of certain traffic mitigation measures.

Rule 59(e) gives this Court the broad power to alter or amend a judgment "if necessary to relieve a party against the unjust operation of the record resulting from the mistake or inadvertence of the court and not the fault or neglect of a party." Rubin v. Sterling Enterprises,

---

[1] The Town's Rule 59 motion was filed on April 26, beyond the ten-day window allowed by V.R.C.P. 59(e).  Appellants originally opposed the Town's motion, but have since withdrawn the objection.  We therefore treat the motion as timely filed.

Inc., 164 Vt. 582, 588 (1996); Reporter's Notes, V.R.C.P. 59(e). There are four principal reasons for granting a Rule 59(e) motion: (1) "to correct manifest errors of law or fact upon which the judgment is based"; (2) to allow a moving party to "present newly discovered or previously unavailable evidence"; (3) to "prevent manifest injustice"; and (4) to respond to an "intervening change in the controlling law." 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2810.1; Drumheller v. Drumheller, 2009 VT 23, ¶ 29, 185 Vt. 417 ("Vermont Rule 59(e) is substantially identical to Federal Rule of Civil Procedure 59(e), and we have looked to federal decisions interpreting the federal rule for guidance in applying the Vermont rule."); see also In re Zaremba Group Act 250 Permit, No. 36-3-13 Vtec, slip op. at 1 (Vt. Super. Ct. Envtl. Div. Apr. 10, 2014) (reviewing Rule 59(e) motion using the four factors outlined in the federal rule). The grant of a motion to alter or amend "a judgment after its entry is an extraordinary remedy which should be used sparingly." Zaremba, No. 36-3-13 Vtec, at 2 (quoting 11 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2810.1). Rule 59(e) motions are not intended as a means to reargue or express dissatisfaction with the Court's findings of fact and conclusions of law, and a motion to alter or amend will be denied where it merely repeats arguments that have already been raised and rejected by the Court. See 11 Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 2810.1.

Here, some of the arguments attempt to reargue matters that were raised prior to and at trial and previously decided. We will not, therefore, restate our analysis or provide detailed responses to every claim made, as our merits decision has adequately done so. Where necessary, we will explain or clarify our decision and may amend findings of facts and conclusions if warranted.

1.      **Amendment of the 75-foot Setback**

Appellants ask that we reconsider and alter our holding allowing an amendment of the 1987 Act 250 permit condition that imposed a 75-foot setback from Patrick Brook and the man-made canal on the southeastern side of the Commerce Park subdivision. Appellants claim that our decision allowing an amendment to the setback relied on evidence that does not appear in the record and that does not address the two "explicit" purposes of the setback condition, stating "that neither the unspecified changes in stormwater design and technology, nor any other evidence in the record, addresses the purposes of the 75-foot setback, and therefore this

condition should not be modified." Appellants' Rule 59 Motion at 3, filed May 2, 2016.[2] Appellants' argument largely focuses on Finding 111, which they argue is not based on evidence in the record and does not provide a basis to amend the setback condition because it has no relevance to the two purposes of the condition. We first address the evidentiary basis for this finding and then turn to relevance. While we take this opportunity to clarify our decision, we find no reason to alter our conclusion that Applicant adequately demonstrated that an amendment of the 75-foot setback condition is warranted.

Finding 111 states, "There have been improvements in stormwater management technology and design over the past 27 years." Appellants challenge this finding, claiming there was no evidence that the stormwater technology proposed for the Project did not exist in 1987. While broadly stated, Finding 111 was intended to capture the fact that there have been improvements and upgrades to the Commerce Park stormwater system since 1987 and that the framework and regulations governing stormwater issues have been expanded since 1987. There is evidence in the record for this, for example, there were upgrades to the Commerce Park stormwater system in 2000, see Applicant's Prefiled Testimony of Paul O'Leary at 12, filed on May 18, 2015;[3] the Stormwater Management Rule became effective on March 15, 2011, replacing the 1997 Stormwater Management Procedures, see ANR Ex. 2; and the latest version of the Vermont Stormwater Management Manual is from 2002. See ANR Ex. 3.[4] As the Vermont Stormwater Management Manual states, "the stormwater treatment field is rapidly evolving and new stormwater management technologies constantly emerge." ANR Ex. 3 at 2-5. All of these subsidiary facts support our finding that, since 1987, there have been improvements to the Commerce Park stormwater system, and the regulatory framework addressing stormwater has evolved.

Appellants also suggest that even if based on the record, Finding 111 is irrelevant to whether a permit amendment may be granted because it bears no relationship to the two explicit

---

[2] Appellants originally filed on April 22, 2016, but were asked by this Court to alter the form of their motion. We treat the original filing date as the date the motion was received, and thus the revised motion is timely.

[3] Some of these upgrades have not yet been implemented and will be completed by Applicant.

[4] The 80% removal target for total suspended solids, a water quality treatment standard, was developed by the EPA as part of the Coastal Zone Act Reauthorization Amendments of 1990. See ANR Ex. 3 at 2-1.

purposes for the setback requirement,[5] which Appellants claim were: "(1) to prevent encroachment into the area of stormwater flooding *from the canal* under criterion 1(D); and (2) to preserve the visual, natural condition of the canal under criterion 1(E)." Appellants' Rule 59 Motion at 2, filed May 2, 2016 (emphasis in original). To begin, we disagree with Appellants' characterization that there are two explicit purposes for the 75-foot setback. There is no statement evincing an explicit purpose for the setback contained in the materials Appellants cite.[6] While the District Commission's Findings of Fact indicate that Project satisfied Criterion 1(D) and 1(E) because of the inclusion of the 75-foot setback condition, the findings do not provide an explicit purpose for the setback condition and make no mention of the visual condition of the canal. See Appellants' Ex. Courtney A, Findings of Fact at 5. Criterion 1(D) and 1(E) are broader than the purposes Appellants attribute to the setback condition, thus the fact that the inclusion of the 75-foot setback satisfied Criterion 1(D) and 1(E), does not establish the two narrow purposes Appellants suggest. See 10 V.S.A. § 6086(a)(1).

What is more, Appellants' claim of irrelevance distorts the multi-factor <u>Stowe Club Highlands</u> analysis directed by Act 250 Rule 34(E). As we explained in our decision, our first step in the <u>Stowe Club Highlands</u> analysis is to determine whether the condition for which Applicant seeks an amendment was critical to the issuance of the permit. If critical, we must weigh the

---

[5] The 75-foot setback provision is found in the 1987 Act 250 land use permit and provides, "Permittee . . . shall maintained undisturbed 75 foot wide buffer areas between any filling, construction or other disturbances and the center line of the streams." Appellants' Ex. Courtney A at 4.

[6] Appellants cite paragraphs 13 and 19 of the land use permit, and pages 5-6 of the District Commission's Findings of Fact for support for the purposes they claim are clear and explicit. Paragraph 13 of the land use permit provides, "The Permittees, and all assigns and successors in interest shall maintain undisturbed 75 foot wide buffer areas between any filing, construction or other disturbance and the centerlines of the streams." Appellants' Ex. Courtney A, at ¶ 13. While this provision is clear that there is a setback, its purpose is not evident. Paragraph 19 states, "Each prospective purchaser of any lot shall be shown a copy of the approved plot plan, the Certification of compliance, and the Land Use Permit before any written contract of sale is entered into." Id. ¶ 19. There is no mention of any setback or purpose in this paragraph. Lastly, the District Commission's findings state, "the Commission finds that the subdivision has been designed to maintain the natural condition of the stream and will not endanger the health, safety or welfare of the public or adjoining landowners because the Applicants have agreed to maintain a 75' foot buffer between the construction and the stream centerlines. The Commission will review amendment applications for the development of lots #1 through#8 and lot#15 for conformance to this standard." Appellants' Ex. Courtney A, District Commission's Findings of Fact at 5–6. First off, the District Commission's finding relates to Criterion 1(E) which is broader than merely preserving the natural condition of streams, and moreover it reaches a result of the setback, not necessarily its purpose or intent. Further, while the finding does support the interpretation that the setback, at least in part, will help maintain the natural condition of the canal, there is no mention of a visual component.

need for flexibility in the land use context with the need for finality in permitting by considering a list of factors, including: "a) changes in facts, law or regulations beyond the permittee's control; b) changes in technology, construction, or operations which necessitate the need for the amendment; c) other factors including innovative or alternative design which provide for a more efficient or effective means to mitigate the impact addressed by the permit condition; [and] other important policy considerations, including the proposed amendment's furtherance of the goals and objectives of duly adopted municipal plans." See Act 250 Rules, Rule 34(E)(4). The upgrades and changes encompassed by Finding 111 are certainly the type of changes we are directed to consider in balancing finality versus flexibility.

Additionally, Finding 111 was not the lynchpin in our decision that Appellants suggest. Despite Applicant's repeated arguments that the 75-foot setback was not a critical condition, and thus our analysis should end at step one, we assumed the condition was critical and moved on to weigh the Rule 34(E) factors. In applying the factors, the fact that there have been improvements to the stormwater system at Commerce Park and updates and expansion to the regulations governing stormwater and watershed protection in Vermont—the fact intended by Finding 111—was one factor in favor of allowing the permit amendment. We also considered the fact that several other properties have been granted much more significant setback amendments to locate within 75 feet of Patrick Brook, a natural stream with greater flood potential than the canal, as well as the fact the canal path was constructed almost immediately adjacent to the canal. Additionally, the robust set of state and local regulations and ordinances that currently exist to manage stormwater and protect water quality was another factor weighing in favor of flexibility. Lastly, we found it important that there was no evidence that the location of the building would negatively impact water quality or the integrity of the canal, and, because Lot 15 was downgradient from the canal, the Project would not increase the risk of flooding of the canal. Based on the totality of these factors, we concluded that a rigid adherence to the 75-foot setback condition established over twenty-seven years ago was not warranted.

Ultimately, Appellants' arguments fail to demonstrate a material mistake of fact or law, and we conclude that there is no reason to alter or modify our holding with respect to the 75-foot setback provision of the 1987 Act 250 permit. We therefore **DENY** Part One of Appellants' Rule 59 motion in the Act 250 matter.

5

**2.        Criterion 9(K)**

Appellants next request that we alter our Criterion 9(K) conclusion, arguing that we applied an incorrect interpretation of the criterion in considering the Project's impacts on the function of the canal path and the public's use and enjoyment of the canal path.  Criterion 9(K), in relevant part, provides that a permit will be issued for development adjacent to public facilities, services, and lands if the development will not "materially jeopardize or interfere with the function, efficiency, or safety of, or the public's use or enjoyment of or access to the facility, service, or lands." 10 V.S.A § 6086(a)(9)(K).  At trial, Appellants argued that the size and proximity of the Project will materially interfere with the public's use and enjoyment of the canal path, and thus must be denied.

In rejecting this argument, we concluded that based on the commercial setting for the Project, the fact that Lot 15 was identified for commercial development well before the canal path was constructed, and the extensive landscaping and visual screening that will be provided, the aesthetic impacts of the Project alone will not materially interfere with the function of the canal path or the public's use or enjoyment of the path.

Appellants now argue that we made three errors in our Criterion 9(K) analysis, claiming first that we misapplied the holding of the 1988 former Environmental Board case, In re Robert and Deborah McShinsky, No. 3W0530-EB, Mem. of Decision (Vt. Envtl. Bd. April 21, 1988), aff'd 153 Vt. 686 (1986); second, that we failed to acknowledge the uncontradicted evidence concerning the function of the path and failed to consider the impacts to that function; and third, that we incorrectly found the Project's impacts to the public's use and enjoyment of the path foreseeable.

Turning to Appellants' first point, as we noted in our decision, there is relatively little case law finding a visual impact alone a material interference with the function of a public facility or the public's use and enjoyment under Criterion 9(K).  At trial, Appellants cited the Environmental Board's decision in McShinsky to support their argument that the Project's impact on the visual and aesthetic experience of users of the canal path is grounds to deny the Project under Criterion 9(K).  We disagreed with Appellants, finding McShinsky distinguishable from the present situation and thus concluding that it did not control our decision because the facts of McShinsky are not comparable to the present context.  Appellants now argue that we applied McShinsky too

6

narrowly, claiming that visual impacts to the public's use and enjoyment are important considerations even where the project does not involve undeveloped lands or natural areas.

Appellants' selective reading of our merits decision fails to demonstrate an error in our interpretation and application of Criterion 9(K). In our decision, we acknowledge that visual impacts may in some cases be grounds to deny a project under Criterion 9(K); however, as the facts of McShinsky demonstrate, the context or baseline from which we must measure the aesthetic and visual impacts from a proposed project matters greatly. In McShinky, the project was on the banks of the White River, which was highly valued because of its pristine state, and the surrounding area was largely undeveloped. That context is far from the setting we have here. Thus, considering the context—a walkway along a commercial subdivision—and the reasonable foreseeability that commercial development would occur on Lot 15 and impact the view from the canal path, we concluded that the size and proximity of the Project will not materially jeopardize the public's use or enjoyment of the canal path. Appellants' arguments do not convince us that this reasoning was in error, and we thus deny Appellants' request to alter or amend this portion of our decision.

Appellants also claim that the evidence established that significant investment has gone into creating a walkway that functions as an aesthetically attractive pedestrian route for recreation and access to services, and that it was unrebutted that there will be a material interference with the function and public's use and enjoyment of the canal path. We do not agree with Appellants' characterization of the evidence. There was no evidence that the Project will cause financial harm to the path; thus any interference is solely based on aesthetic impacts. Appellants' attempt to incorporate a strict aesthetic component into the analysis of the "function" of the path fails to recognize the path's context and surroundings. Accepting that the function of the path is to provide an aesthetically attractive walkway to services in Hinesburg, the path's function must take account of the reality of the path's location—positioned between a commercial subdivision and a town road, with commercial development on all sides. Thus while we agree that an aesthetically pleasing walkway should be the goal, the term "aesthetically pleasing" is framed by the commercial context.

7

Appellants' evidence was certainly not uncontradicted. Appellants' experts' testimony did not establish that a material interference will occur.[7] There was no testimony from the perspective of the average canal path user, and there was nothing beyond speculation to establish that the Project will cause a material decrease in use. Rebutting the testimony from Appellants' witnesses, Applicant's experts provided extensive evidence and testimony that the landscaping, screening, and the exterior design of the building will mitigate negative visual impacts, and that with the Project the path will still provide a pleasant walkway.

Lastly, as to the foreseeability of impacts to the path, our holding was not that Appellants should have known that this particular development would occur, but, rather, that the impacts that will result from the development were foreseeable, i.e., that a prudent person should have anticipated that a sizeable development could occur on Lot 15 and impact the setting and view from the canal path. This is not to say that Criterion 9(K) cannot be violated where future development is possible. But here, it would be inappropriate for our Criterion 9(K) analysis of "material interference" to ignore the fact that development on Lot 15 was certainly predictable at the time investment in the canal path occurred. The path was placed adjacent to a commercial subdivision with many commercial businesses, the zoning regulations permit a store of this size, and the aesthetics of the store building and its conformance with the character of the area surpass much of the surrounding development. Appellants' would have us ignore this backdrop and solely consider the Project's impacts on their idyllic characterization of the canal path. We decline to do so.

In summary, considering the commercial setting, the foreseeability of development on Lot 15, and the steps that Applicant will take to screen the Project and mitigate any adverse impacts, we conclude that the Project will not materially interfere with the function or public's

---

[7] As we discussed in our analysis of Criterion 8 in our merits decision, the testimony of Ms. Morgante and Ms. Courtney does not provide the perspective of the average Hinesburg resident. Ms. Morgante was heavily involved in the implementation of the canal path and was the project coordinator for the Hinesburg Streetscape project. Ms. Courtney was offered by Appellants as an expert witness with specialized knowledge in landscape architecture. Similarly, Mr. Kielman was offered as an expert in architecture. While these witnesses offered valuable and relevant testimony about the design of the proposed store, the history and investment in the canal path, and the adequacy of the landscape plans, their opinion as to whether the Project will materially interfere with the function of the path and the public's use and enjoyment is unpersuasive.

use and enjoyment of the canal path. We therefore **DENY** Part Two of Appellants' Rule 59 motion.

3. **Factual Findings Concerning Stormwater**

There were many areas in this matter where we were required to make a credibility determination between two or more opposing expert opinions. This was particularly true in our analysis of stormwater impacts under Criterion 1. Appellants now claim that our factual findings lacked reasonable footing in the evidence, arguing that the testimony of their expert, Andres Torizzo, went uncontradicted, and thus it was error for this Court to conclude that the Project's stormwater impacts will not endanger the public health, safety, or welfare.

With broad strokes, Appellants disregard the significant competing evidence that was presented by both sides as to the stormwater impacts of the Project during the projected 1, 10, 50, and 100-year storm. As we are required to do in such a situation, we considered the most credible evidence and asked whether such impacts were prohibited by Act 250 Criterion 1. Appellants may disagree with our conclusion, but Appellants have failed to offer any evidence or testimony we overlooked or failed to consider, and we therefore **DENY** Part Three of Appellants' Rule 59 motion.

4. **Subsequent Permitting to Meet Act 250**

Appellants next claim that we erred in concluding that the proposed East-West grass swale will be an appropriate and sufficient water quality treatment measure. Appellants argue that their evidence was uncontradicted that the East-West grass treatment swale will not function properly; will be plagued by standing water, excess vegetation; and will create a breeding ground for insects and pests. They further argue that we relied on conditions subsequent in finding the East-West swale compliant with Criterion 1. This is a strained interpretation of our holding. Appellants claims are largely re-argument of matters that were previously raised and decided.

Applicant submitted detailed plans for the stormwater system for the Project. This evidence included specifics on how the East-West grass swale would function, such as a residence time of 14.1 minutes and a velocity of 0.25 feet-per-second. Our approval was based on Applicant's evidence and representations, and, therefore, to comply with its permit, Applicant

must install and operate a grass swale that conforms to the evidence presented. See In re Hamm Mine Reclamation Act 250 Jurisdiction Op. #2-241, No. 271-11-06 Vtec, slip op. at 11 (Vt. Envtl. Ct. Sept. 27, 2007) (concluding that site plans, although not numbered conditions, must be adhered to). This is not an impermissible condition subsequent, for Applicant proposes to build a grass swale that meets certain design and functional standards. See In re Treetop Dev. Co. Act 250 Dev., 2016 VT 20, ¶ 12 (permissible permit conditions include "those necessary to ensure that the development is completed as approved."). The failure to meet the specifications of its proposed stormwater system is a violation of its permit and could lead to an enforcement action by the Natural Resources Board or ANR. See id. ¶ 13. We therefore **DENY** Part Four of Appellants' Rule 59 motion; Applicant's plans call for a properly functioning grass swale and our approval requires as much.

5.    **Traffic Mitigation Measures**

The parties' post-trial motions to reconsider request that we alter or amend conditions we imposed to mitigate the traffic impacts from the Project.

First, the Town, Applicant, and Appellants all raise challenges to the condition we imposed for the Mechanicsville Road and Route 116 intersection requiring the installation of a traffic signal before the Project may move forward, but only requiring Applicant to pay its proportional share. The Town requests that we amend this condition to recognize that the Vermont Agency of Transportation (VTrans) controls whether changes to Route 116 are made and to hold that Applicant shall pay the full cost of any traffic mitigation measures at the Route 116 and Mechanicsville Road intersection. Similarly, Appellants request that we amend our decision so that Applicant must bear the full cost of the required traffic signal. Conversely, Applicant requests that we amend our holding to make clear that it only need escrow its proportional share of the mitigation, and that if the Town and VTrans do not wish to go forward with a traffic signal the Project may nevertheless go forward.

Second, both Applicant and Appellants, although for differing reasons, ask that we modify the condition of our approval that Applicant and the Town conduct a post-development traffic study at the Route 116 and Commerce Street intersection to ensure that the southbound 185-foot left-turn lane is adequate mitigation.

Turning first to the traffic-signal condition, we begin by noting that our ability to condition our Act 250 approval is constrained by the evidence presented and by our legal authority. At trial we were presented with uncontradicted evidence that the Mechanicsville Road and Route 116 intersection experiences significant delays and congestion and that the additional traffic from the Project will exacerbate these unacceptable conditions. By law, we cannot deny a project that exacerbates unreasonable congestion or unsafe conditions, but we must impose mitigation to alleviate the unacceptable conditions. See In re Agency of Transp., 157 Vt. 203, 207 (1991). A traffic signal was the only offered mitigation for the existing and projected traffic conditions, and no party that participated at trial, including the Town of Hinesburg and the NRB, challenged the need for mitigation in the form of a traffic signal or its appropriateness in addressing the traffic conditions at the Mechanicsville Road/Route 116 intersection. It was also uncontested that the Project was not the sole cause of the traffic concerns at the intersection. Applicant offered that the Project would only contribute about 9% of the total volume of traffic at the intersection and thus should only be required to pay its proportional share of the cost of the signal—which, according to Applicant's calculations, is $25,000.[8]

In light of this evidence, we concluded in our decision that a traffic signal at the Route 116 and Mechanicsville Road intersection, coordinated with the other lights along Route 116, was required traffic mitigation under Act 250 Criterion 5. Further, because it was clear that Applicant was not the sole cause of the traffic problem, we only required Applicant pay its proportional share of the light, but specified that a signal was necessary before the Project could move forward, leaving the financing details up to the involved parties, as we had no evidence of potential cost sharing details. We rejected Applicant's offer to escrow $25,000, because merely providing a portion of the cost of the signal, without any guarantee that the signal is installed, is not sufficient for Project approval; escrowing the funds does not equate to fulfilling the necessary mitigation.

Appellants now claim that we erred by not ordering Applicant to pay the full cost for the traffic signal, arguing there is no authority for this Court to require other parties to pay for the

---

[8] Applicant claims the Project will only contribute about 9% of the overall traffic at the intersection and thus it should only be required to pay 9% of the total cost of the signal. Thus since a signal costs about 250,000–300,000 dollars, Applicant asserts it should only be required to pay $25,000. We have no evidence causing us to question the accuracy of Applicant's offer.

11

signal, and Applicant should be responsible for 100% of the cost of necessary mitigation for the Project. Applicant, meanwhile, requests that we alter our decision so that Applicant only be required to escrow its proportional share of the funds for the signal but make clear that the Project may go forward even if the Town and State, parties with final say for any traffic signal, delay or ultimately do not want a signal installed. The Town, which was largely silent at trial on this issue, now asks that we amend our decision, offering that the Vermont Department of Transportation (VTrans) controls whether or not changes are made on Route 116, the Town's "enthusiasm for a traffic signal at the Mechanicville [sic] Road intersection is questionable" and the Town "suspects the other Parties are similarly unenthused," and the Town "is not clear that the evidence supported the ordering of the traffic signal." Town's Rule 59 and 60 Motion at 1, filed on Apr. 26, 2016. Similarly, in a May 26, 2016 response to the motions to alter or amend, the NRB offers that it "has conferred with the Agency of Transportation. VTrans has informed the NRB that it has no construction projects included in its Capital Program for the intersection of VT 116 with Mechanicsville Road or Commerce Street . . . and consequently will not participate financially in any upgrades required by the Court." NRB's Response to Pending Motions to Alter/Amend at 1, filed May 26, 2016.

Turning first to the claims by the Town and NRB, such representations are, at the least, unhelpful and compel us to ask, why was this evidence was not offered at trial? Both the Town and NRB actively participated and were well aware that the only proposed mitigation for the Mechanicsville Road and Route 116 intersection was a traffic signal, for which Applicant was offering to pay $25,000 of the total cost. Now, well after trial, the Town and NRB, without pointing the Court to any place in the record where this information is available, seek to offer additional evidence that the Town and VTrans are not interested in a traffic signal. Such an offer is dilatory and improper.

In response to Appellants' challenge, we are unaware of authority, and Appellants fail to provide any, establishing that an applicant must pay the full cost of a traffic mitigation measure when the project will only add a small percentage of the total traffic at the problem intersection. Yet, Applicant's offer to provide a portion of the cost of the signal in escrow is not sufficient for Project approval. Criterion 5 cannot be satisfied by Applicant's monetary offer of its proportional share without any assurance that the necessary signal will be installed.

Ultimately, we are unpersuaded by any of the parties' arguments. Applicant has been seeking approval of its Project for many years. Surely the parties had ample time to consider the situation and be prepared to present a clear position and evidence supporting that stance. At trial, the only mitigation offered was a traffic signal. Furthermore, no information or evidence was presented on how costs could be allocated or who other potential responsible parties could be. It would be inappropriate, therefore, for this Court to dictate the financial mechanics of the traffic signal. As we held, and we repeat here, mitigation for the Mechanicsville Road and Route 116 intersection is a necessary condition of our approval. The only mitigation offered at trial was a traffic signal that would be coordinated with the other lights along Route 116. Therefore, this traffic signal must be installed and coordinated before the Project may be completed. We therefore **DENY** the parties' motions to alter our holding concerning the traffic signal at the Route 116 and Mechanicsville Road intersection.

Turning to the condition we imposed requiring a post-development traffic study at the Route 116 and Commerce Street intersection, we begin by highlighting that our analysis of traffic impacts and necessary mitigation is by its nature, purely predictive. Recognizing this realty, although there was compelling evidence that the traffic mitigation measures Applicant proposed for the Route 116 and Commerce Street intersection adequately dealt with the projected traffic conditions, we imposed the condition that Applicant and the Town conduct a traffic study post-development to determine if additional mitigation was necessary. This measure was intended to accommodate Appellants' concerns that a 185-foot left turn lane was not of a sufficient length. Now, in their Rule 59 motion, Appellants argue that this condition deprives Appellants of their statutory right to participate in the process of determining whether the turn lane is adequate because they were afforded no role in the post-development study. Upon further review of the evidence and in light of the participation concerns raised by Appellants, we determine that a revision to our decision is warranted. We therefore **GRANT in part** Applicant's and Appellants' motion to alter and issue an amended decision striking the post-development traffic study from the measures we impose as necessary mitigation.[9] In so doing, we affirm our conclusion that the credible evidence establishes that the Project satisfies Criterion 5 with the improvements

---

[9] The Town's motion asks that we clarify that Applicant must pay the entire costs of the traffic study, as we remove the condition requiring a traffic study, the Town's request is moot.

13

Applicant has proposed for the Route 116 and Commerce Street intersection. Thus, no further traffic studies are necessary.

## Conclusion

While our decision here offers to clarify our Decision on the Merits in Docket No. 113-8-14 Vtec, we **DENY in part** Applicant's requests to alter or modify our decision, and we **DENY in part** Appellants' motion to alter. We also **DENY** the Town's Rule 59 motion. Lastly, we **GRANT in part** Applicant's and Appellants' motion to alter and remove from our Act 250 approval the condition that Applicant and the Town conduct a post-development traffic study.

An Amended Decision on the Merits and an Amended Judgment Oder are issued with this Decision.

Electronically signed on July 07, 2016 at 10:12 AM pursuant to V.R.E.F. 7(d).

_Tom Walsh_
_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division